UNITED STATES of America,
Plaintiff–Appellee,

v.

D.G. SEAGO, Jr., Defendant–Appellant.

No. 90–6022.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 22, 1991.

Decided April 12, 1991.

Sidney P. Alexander (argued), Asst. U.S. Atty., W. Hickman Ewing, Jr., U.S. Atty., Office of the U.S. Atty., Memphis, Tenn., for plaintiff-appellee.

Sam Bradley (argued), Memphis, Tenn., for defendant-appellant.

Before KEITH and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.

KEITH, Circuit Judge.

Defendant D.G. Seago ("Seago") appeals from the district court's July 6, 1990, judgment and sentencing order entered pursuant to a guilty verdict for wire fraud and bank fraud. Seago raises three issues on appeal: (1) whether the district court erred in denying his motion for new trial based on newly discovered evidence; (2) whether the district judge's comments on the evidence warrant reversal of Seago's conviction; and (3) whether the district court committed reversible error in excluding certain business records. Finding no errors which warrant reversal, we AFFIRM.

## I.

### A.

Seago was the chairperson and president of Mid Continent Systems, Inc. ("Mid Con"). In these roles, he controlled the company's financial dealings. Mid Con was the parent company of several subsidiaries, two of which were Bessemer Oil Company ("Bessemer") and Convenience Marketers, Inc. ("CMI"). The daily operations of Mid Con required a cash flow of large amounts of money in order to meet its obligations. Mid Con's major source of revenue came from collecting on its accounts receivable. The accounts receivable were pledged as security to Signal Capital Corporation ("Signal") pursuant to a loan agreement between Mid Con and Signal. This loan agreement established an $8 million revolving promissory note. Under the terms of the revolving note, Signal was committed to making loans to Mid Con to the extent such loans did not exceed, in the aggregate, the lesser of $8 million or 85% of eligible accounts receivable. Mid Con maintained the loan balance at or near the maximum amount during the life of the revolving loan. Mid Con would send checks to Signal on a daily basis to reduce the loan balance which would then provide additional availability to borrow on the revolving note.

Some of Mid Con's checks were drawn on a checking account at the First American Bank of Memphis ("First American"). Seago established an account at First American on February 12, 1987. The First American account was generally used to deposit collections on Mid Con's account receivables.

Mid Con also maintained operating checking accounts at First National Bank of Vicksburg, Mississippi ("First National"). These accounts were known as zero-balance accounts, i.e., no funds were kept on balance in the accounts. Checks were written on the accounts; and when the checks were presented for payment at First National, officials at First National would notify Mid Con of the amount. Mid Con would then wire funds to First National before the end of the day to cover such checks. There were seven individual accounts at First National, including one for Bessemer and one for CMI. The primary source of funds to cover the checks presented for payment came from loan advances from Signal. The amount of funds available for an advance depended on the amount that Mid Con had paid the preceding work day toward the balance owed on the revolving note.

Since the availability of funds was established the day before it was needed, each day Mid Con had to account for the checks expected to be presented for payment at First National the next day. Herman Stiedle ("Stiedle"), the cash manager and treasury supervisor for Mid Con, performed this duty. Occasionally the amount Mid Con could obtain from Signal was insufficient to cover the predicted amount due at First National on the next day. This insufficiency occurred when Mid Con borrowed the maximum of the revolving loan.

There were two methods to create the availability for a larger loan advance: (1) pay more money on the revolving note; or (2) increase the value of the accounts receivable. When Stiedle predicted that Mid Con's cash needs for the next day would exceed their loan availability at Signal, Seago instructed Stiedle to draw a check on the Bessemer or CMI accounts (each of which had a zero balance), make it payable to Mid Con and deposit the check into the First American account. These checks were large, round dollar amounts. This practice had the effect of increasing the balance of the First American account and enabling Mid Con to borrow additional money, which was not secured by receivables, from Signal.

The same day these checks were deposited into the First American account, Seago signed and sent a check to Signal, via Federal Express, drawn on the First American account. Along with this check, Seago sent the third page of a Mid Con document, known as a Consolidated Cash Report, which reflected the collections for the day deposited into the Mid Con account. The subsidiary checks were not individually listed; instead, their amounts were lumped in

with all other daily collections deposits. The amount of the First American check would be applied to pay down the revolving note and create additional availability for borrowing for the next day.

The First American check consistently would be in the amount of the total First American deposits, which would include regular receipts and the subsidiary checks. The subsidiary checks written and deposited into the account at First American were given next day credit. Within two or three days, the subsidiary checks were then presented for payment at First National. This would require Mid Con to cover these checks, as well as all other checks written by Mid Con in the ordinary course of business, by borrowing the money from Signal.

Stiedle was able to foresee when these checks would reach First National and would have to assess whether Mid Con would have the resources to cover the subsidiary checks based on the availability for a loan advance from Signal. On occasions when there was insufficient availability with Signal, Seago instructed Stiedle to deposit another subsidiary check into the First American account to increase the balance. The additional subsidiary check deposit allowed Seago to sign and send a larger check to Signal.

At first, this deposit scheme was used intermittently. It later became a daily practice. The deposit scheme continued until on or about August 12, 1987, when Signal discovered it and refused to advance funds which it felt had been created by this method. Occasionally, Stiedle would ask Seago if they could discontinue this deposit practice. Seago, however, would not consent to ending the practice.

Stiedle maintained a daily worksheet to account for the subsidiary checks that were outstanding. The worksheet detailed all checks due at First National, as well as other outstanding debts. Stiedle would make a notation on the worksheet to designate the amount and the account name of the subsidiary check that was presented for payment. Stiedle noted this information on page two of the cash report which was not sent to Signal. In the early stages

of the scheme, a check on the Bessemer account would be deposited into the First American account in order to increase the collections. The next day, the check would be written on the CMI account. It would alternate in this manner until the amounts needed grew larger. At that point, two checks would be deposited daily, one drawn on the Bessemer account and one drawn on the CMI account. It was not uncommon to see two subsidiary checks totaling over $1 million included in the deposits to the First American account. All such checks were drawn on the zero-balance account at First National. This deposit scheme resulted in Signal funding the very checks used by Mid Con to pay down the loan.

Occasionally, more money would be needed at First National than Stiedle had predicted and there would be insufficient availability at Signal to cover the checks at First National. On these occasions, Seago instructed Stiedle to wire transfer funds from First American to First National to cover the checks. On at least sixteen occasions, Seago found that there was insufficient availability at Signal to enable a loan advance to cover the checks presented for payment at First National. If the wire transfers of funds were not made, then Mid Con had insufficient funds to pay checks, including previously written subsidiary checks, at First National. If this event occurred, the whole check scheme would collapse.

## B.

The Signal representatives who directly supervised the account with Mid Con were David Anderson ("Anderson") and Arlin Cate ("Cate"). Anderson began his relationship with Mid Con as an auditor for Signal. In September 1986, Anderson was promoted to the position of account executive in charge of the Mid Con account. In this capacity, he handled the daily operations of the loan with Mid Con and approved advances on the revolving note. Anderson also reviewed the collateral reports that were sent in by Mid Con. In early May 1987, while verifying certain Mid Con accounts receivable, Anderson discov-

ered some discrepancies in the reports of the collateral base. His investigation of the matter led him to discover that Mid Con had been overstating its account receivables, thereby inflating its collateral base. This inflation of the collateral base had the effect of allowing Mid Con to borrow more than the agreement allowed. Seago was confronted with this revelation and told to stop the inflation practice. Seago was also informed to seek alternate financing because he could no longer be trusted. Because Seago inflated the collateral base, Mid Con was allowed to borrow an excess of $3.2 million over its entitlement. Signal continued the revolving loan arrangement making adjustments in the loan to account for the $3.2 million over his entitlement.

In July 1987, Signal instructed Mid Con to begin submitting daily collateral reports instead of monthly collateral reports. Signal further required the reports to be split into two areas—one for the petroleum business and one for the financial business. This was done in an attempt to increase the monitoring of the account. Bessemer and CMI were on the petroleum side of the business. As a result of this split reporting, Signal saw that the larger collections were on the petroleum side which was exactly opposite of what was expected. In search of an explanation, Anderson's immediate supervisor, Arlin Cate, went to Mid Con on August 12, 1987, to examine the books and records of the company. In checking the petroleum side's supporting documents for the previous day's deposits at First American, Cate found two large round-dollar checks written on the Bessemer and CMI accounts, in addition to the normal checks. Cate then suspected that these checks were being used to pay down the loan at Signal to create additional availability so that Signal would wire funds to First National to cover the checks. Upon checking additional days' deposits, Cate found the same type of activity. The amounts of the checks showed a steady increase until the date of Cate's investigation. Prior to this August 12, 1987, discovery, Cate was not aware that these subsidiary checks were being deposited at First American. Upon Cate's return to

Signal, he informed Anderson of his discovery and showed him copies of the recent checks.

Anderson had not been aware of Mid Con's practice of depositing subsidiary checks into the First American account in order to increase the collections. Anderson was aware of the zero-balance nature of the First National checking accounts and that Signal funded these accounts from the revolving note. On or about August 12, 1987, Anderson reviewed Mid Con's documents which revealed the deposit scheme to inflate the amounts sent to Signal that would provide availability to borrow more money than they could otherwise borrow. His further investigation revealed the pattern of depositing the large, round-dollar, Bessemer and or CMI checks into the collections account at First American over the period of February 1987 to August 1987. Shortly after the discovery of this scheme, Signal refused to advance any funds which were affected by the subsidiary checks.

At trial, Cate testified with the use of summary charts for the period of February 1987 through August 13, 1987, which showed the amounts of the subsidiary checks, how they affected loan availability, and the amounts that Mid Con, using the check scheme, was able to borrow in excess of its entitlement under the loan agreement.

After Signal refused to advance any funds affected by the subsidiary checks, four subsidiary checks totalling $2,115,000 were not honored and were returned to First American unpaid. The First American account at the Federal Reserve was charged the $2,115,000 and First American bore the loss for approximately eighteen months. Through a banking technicality, First American was eventually able to shift the $2,115,000 loss to First National.

II.

On February 23, 1989, a federal grand jury returned a eighteen count indictment. D.G. Seago was charged with sixteen counts of wire fraud, in violation of 18

U.S.C. § 1343,[1] in a scheme to defraud Signal Capital Corporation in Dallas, Texas and First American Bank in Memphis, Tennessee. The scheme to defraud was alleged to have occurred between February 1, 1987, to August 1, 1987. Seago was also charged with two counts of bank fraud, in violation of 18 U.S.C. § 1344.[2] Seago was arraigned on March 2, 1989, on a plea of not guilty.

Seago's jury trial commenced on February 26, 1990. In his defense, Seago maintained that the subsidiary checks written on the First National account and deposited into the First American account were payments on debts owed by the subsidiaries, Bessemer and CMI, to the parent company, Mid Con. Seago described these intercompany payments as a "revolver" loan between Mid Con and the subsidiaries. When the subsidiary wrote a check payable to Mid Con, it reduced the debt by the amount of the check, yet when Mid Con paid the check at First National, the subsidiary again owed the debt to Mid Con in the amount of the checks. Seago admitted, however, that no money existed to back the transactions and that they depended on the loan agreement between Signal and Mid Con to fund the checks. Had Seago not directed the deposit of the subsidiary checks, Mid Con would not have been able to meet the next day's obligation of funds. Seago admitted that he directed the deposit of the subsidiary checks to increase his availability on the Signal revolving loan.

On March 8, 1990, the jury returned its verdict of guilty on all eighteen counts. On June 4, 1990, Seago filed a motion for new trial based on allegations of newly discovered evidence.

On June 6, 1990, a motion to relieve trial counsel from further representation was filed with the court. On the same day, the district court granted a consent order substituting Sam P. Bradley as counsel. Also on June 6, 1990, a motion for leave of court to amend the motion for new trial and for continuation of sentencing was filed. On June 7, 1990, the district court denied the pending motions.

On June 21, 1990, Seago was sentenced to confinement for thirty-six months and ordered to pay restitution in the amount of $2,115,000 to the First National Bank of Vicksburg. On July 6, 1990, the district court entered the judgment and sentencing order.

On July 16, 1990, Seago filed a notice of appeal. Subsequently, the district court denied Seago's motion for bail pending appeal.

### III.

### A.

On appeal, Seago argues that the district court erred in denying his motion for new trial based on newly discovered evidence that his trial counsel's assistance was ineffective in violation of the sixth amendment. Seago reasons that because he did not appreciate the significance of his trial counsel's conduct until after the trial, such ineffective assistance of counsel is newly discovered evidence. Seago's ineffective assistance of counsel claim is based on his trial counsel's failure to pursue Seago's theory that Signal knew of and acquiesced

1. 18 U.S.C. § 1343 provides:

 Whoever, having devised or intended to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both.

2. 18 U.S.C. § 1344 provides:
 Whoever knowingly executes, or attempts to execute, a scheme or artifice—
 (1) to defraud a financial institution; or
 (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
 shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both.

in the banking scheme, thereby precluding a finding of fraud.[3] To skirt the "newly discovered" evidence requirement of Rule 33, Seago cleverly attempts to shift the focus of our review away from evidence which he and his trial counsel were aware of at trial to his trial counsel's strategy which was unsuccessful in obtaining a not guilty verdict. Because Seago was aware during trial of his trial counsel's election to pursue an alternate strategy, we are unpersuaded by Seago's contention that his ineffective assistance of counsel claim constitutes newly discovered evidence.

■ Federal Rule of Criminal Procedure 33 provides in pertinent part:

The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilt or within such further time as the court may fix during the 7–day period.

The decision to grant or deny a motion for new trial rests within the district court's sound discretion. We will not reverse the district court's ruling on a motion for new trial absent a clear abuse of discretion. *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir.1986), *cert. denied*, 484 U.S. 859, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987). Motions for a new trial based on newly discovered evidence should be granted with caution. *Id.* ("Motions for a new trial are disfavored...."); C. Wright, FEDERAL PRACTICE AND PROCEDURE § 557 at 315 (1982) ("No court wishes a defendant to remain in jail if he has discovered evidence showing that he is not guilty, but after a man has had his day in court, and has been fairly tried, there is a proper reluctance to give him a second trial."). The defendant

bears the burden of showing that a new trial ought to be granted.

■ Although the plain language of Rule 33's text requires the evidence to be newly discovered, courts have narrowly construed the rule by placing limitations on the new evidence that may warrant the grant of a motion for new trial. The defendant must establish the following: (1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce acquittal. *O'Dell*, 805 F.2d at 640; *accord United States v. Oliver*, 683 F.2d 224, 228 (7th Cir.1982); *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980); *United States v. Antone*, 603 F.2d 566, 568–69 (5th Cir.1979).

■ The first prong of the *O'Dell* test requires the newly discovered evidence to be evidence not known by the defendant at the time of trial. The majority view among the circuits is that an ineffective assistance of counsel claim cannot be considered newly discovered evidence for the purpose of a motion for new trial because the facts that give rise to the claim are necessarily known to the defendant at the time of the trial. *See, e.g., United States v. Lema*, 909 F.2d 561, 565 (1st Cir.1990); *United States v. Miller*, 869 F.2d 1418, 1421–22 (10th Cir. 1989); *United States v. Ugalde*, 861 F.2d 802, 806–07 (5th Cir.1988), *cert. denied*, 490 U.S. 1097, 109 S.Ct. 2447, 104 L.Ed.2d 1002 (1989); *United States v. Dukes*, 727 F.2d 34, 38 (2d Cir.1984); *United States v. Lara–Hernandez*, 588 F.2d 272, 275 (9th Cir.1978); *United States v. Ellison*, 557 F.2d 128, 133 (7th Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977). *But see United States v. Brown*, 476 F.2d 933, 935 & n. 11 (D.C.Cir.1973) (permitting defendant to raise issue of ineffective assistance of counsel and to support claim with evidence outside the record either on a motion for new trial or on collateral attack). The Sixth Circuit has not

---

3. Because the entity alleged to be defrauded in counts seventeen and eighteen was First American, the motion for new trial related only to counts one through sixteen of the indictment.

established a binding precedent on this issue. *See United States v. Oren,* 622 F.Supp. 936, 939 (W.D.Mich.1985). We now join the majority of circuits who have reached this issue in concluding that evidence of ineffective assistance of counsel is not newly discovered evidence for purposes of a motion for new trial where the facts supporting the claim were within the defendant's knowledge at the time of trial.

*United States v. Ellison,* 557 F.2d 128 (7th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977), is particularly instructive on this point. In *Ellison,* the Seventh Circuit held that where facts alleged in support of a motion for new trial were within the defendant's knowledge at the time of trial, such motion may not be treated as one in the nature of newly discovered evidence. *Id.* at 133–34. The defendant in *Ellison* alleged that his privately retained counsel made tactical errors in the course of his trial, such as refusing to challenge allegedly inaccurate statements made at trial and, as in the instant case, declining to call various witnesses at Ellison's behest. *Id.* at 131. The Seventh Circuit held that since the underlying facts of Ellison's ineffective assistance of counsel claim were known to Ellison at the time of trial, they did not constitute "newly discovered" evidence for the purposes of Rule 33. *Id.* at 133. The *Ellison* court stated:

> The practical difficulties faced by defendants seeking to raise ineffective-assistance-of-counsel claims by way of motions for a new trial, however, do not give us cause to corrupt the clear language of Rule 33. Newly discovered evidence must be newly discovered.

*Id.* The *Ellison* court acknowledged that its holding was contrary to the D.C. Circuit's holding in *Brown.* The Seventh Circuit indicated that *Brown's* "relaxation of the normative notions of 'newly discovered' evidence" was prompted by the D.C. Circuit's view that, because of the strong interest in preserving the finality of judgments, a defendant in a collateral attack proceeding has a heavier burden of showing ineffective assistance of counsel than a defendant in a motion for a new trial. In *Ellison,* however, the Seventh Circuit found that "the same finality interests and practical considerations come into play where, as here, a motion for a new trial based on newly discovered evidence is filed more than seven days after verdict." *Id.* at 133–34 & n. 3. We agree with *Ellison's* holding and rationale and find them applicable to the instant case.

Tactical errors committed in the course of trial, such as a failure to pursue the defense of Signal's acquiescence, are facts within Seago's knowledge at the time of trial. Seago reasons that he did not appreciate the legal significance of his counsel's rejection of the defense until after trial. However, we believe that "[a]n interpretation that would consider facts known at the time of trial to be 'newly discovered,' if cloaked in the garb of a claim of ineffective assistance of counsel flies in the face of the plain meaning of the rule and the traditional understanding of the narrowness of the time exception." *Lema,* 909 F.2d at 566. The *Ugalde* court addressed the issue presently before us and determined that the language of Rule 33 requires that the evidence itself, not merely the legal implications of the evidence, be newly discovered. 861 F.2d at 806–07.

The district court properly denied the motion because the evidence was not, in fact, newly discovered. Where facts alleged in support of an ineffective assistance of counsel claim were known by the defendant at the time of trial, the defendant failed to satisfy the newly discovered evidence requirement of Rule 33. We interpret Rule 33 to proscribe attempts to change defense strategy after an unfavorable verdict by claiming that evidence that the defendant or defense counsel knew but elected not to present at trial is newly discovered.

Seago contends that he was not aware of his counsel's ineffective assistance at the time of trial. Seago's claim of ineffective assistance of counsel is based on the failure of trial counsel to develop Seago's defense that Signal knew of the check scheme and acquiesced in it. Yet this claim is undermined by Seago's testimony. In addition to the affidavits of former Signal

employees, Seago proffered his own affidavit in support of his motion for new trial. Seago testified that "[trial counsel] was further urged to fully develop the defense of knowledge of and willing participation by Signal Capital Corporation." Joint Appendix at 54 (Motion for Leave to Amend Motion for New Trial and Continuance of Sentencing). Thus at trial, if not prior to trial, Seago was aware that his counsel rejected the defense that now gives rise to Seago's claim of newly discovered evidence of his counsel's ineffective assistance.

Seago's trial counsel's pursuit of an alternate theory which was not persuasive does not, after the jury's verdict, constitute newly discovered evidence of ineffective assistance of counsel. Seago contends that, as a layperson, he did not understand the legal significance of this material. Seago's failure to appreciate the legal significance of his trial counsel's development of an alternate defense theory does not transform evidence discussed prior to trial into "newly discovered" evidence within the meaning of Rule 33. *See United States v. Ugalde,* 861 F.2d at 806. A claim "[b]elatedly pursued is not newly discovered." *United States v. Molovinsky,* 688 F.2d 243, 248 (4th Cir.1982), *cert. denied,* 459 U.S. 1221, 103 S.Ct. 1228, 75 L.Ed.2d 462 (1983). We, therefore, conclude that Seago did not satisfy the first prong of the *O'Dell* test.

We will turn briefly to the three remaining prongs of the *O'Dell* test which also have not been satisfied. *O'Dell* requires the defendant to establish that the evidence could not have been discovered earlier with due diligence. Seago had discussed the abandoned defense theory with trial counsel before trial, but they chose not to pursue it. Joint Appendix at 54. That the affidavits of Signal's ex-employees were not taken is evidence of a lack of diligence to pursue every defense theory available. Thus the second prong of *O'Dell's* test is not met.

*O'Dell* also requires the defendant to establish that the evidence is material

and not merely cumulative or impeaching. In his motion for new trial, Seago produced affidavits and exhibits in an attempt to show that unnamed officials at Signal had actual knowledge of the scheme. Seago chose a one-week period during May 1986 as a representative period to demonstrate Signal's knowledge and participation in the scheme. Seago pointed to a June 1986 audit of Bessemer conducted by Steven Bakken, Signal's auditor. Seago contended that a review of May 23–30, 1986, revealed three checks written on Bessemer's zero-balance First National account to Mid Con in the amounts of $295,000, $491,000 and $495,000 during the seven-day period. Because these checks were in excess of $25,-000, they were scheduled by the auditor and included in his work papers. Seago argued that the June 1986 audit of Bessemer provided Signal with complete and full disclosure of Mid Con's intercompany check writing activity for the purpose of obtaining "float funds" necessitating a like amount of loan availability from Signal.

Representatives of Signal testified during Seago's trial that Signal did not know of the fraudulent scheme prior to August 12, 1987. Signal terminated funding of Mid Con shortly thereafter. Signal representatives further testified that Mid Con and Bessemer were audited by Signal every three or four months during the term of the loan, from 1983 through mid August 1987. However, the audits did not disclose the existence of the zero-balance subsidiary check writing scheme. If the testimony provided by former Signal employees were admitted, it would merely serve the purpose of impeachment.[4] The district court found that there was clear and complete testimony from Anderson, the account executive, and Cate, the regional operations manager, that they did not have knowledge of the fraudulent scheme prior to its discovery on or about August 12, 1987. Joint Appendix at 25, 35. Thus, *O'Dell's* third prong, requiring the evidence to be some-

---

**4.** The affidavits' utility for impeachment is severely limited. Since the affidavits pertained to conduct prior to 1987, they failed to establish actual knowledge of the fraud alleged in the indictment.

thing material and not merely cumulative or impeaching, also has not been met.

■ *O'Dell's* fourth prong requires the defendant to establish that the evidence would likely produce acquittal. The district court properly found that "[e]ven though Signal had regularly audited the books and records of Mid Con and its subsidiaries, there is overwhelming proof that officials of Signal responsible for the Mid Con account did not learn of the particular scheme until early August of 1987." *Id.* at 35. The affidavits failed to overcome the trial testimony of David Anderson and Arlin Cate who testified that Signal did not have actual knowledge of the scheme to defraud until August 12, 1987. We note that Anderson was cross-examined at length regarding the investigation of the scheme. We conclude that the evidence would not likely produce acquittal. Perhaps it would have created a conflict in the evidence, but such conflicts do not amount to a likelihood of acquittal. *See United States v. Scaife,* 749 F.2d 338, 349 (6th Cir.1984). Accordingly, Seago fails to satisfy his burden of showing a clear abuse of discretion by the district court in denying the motion for a new trial because he has failed to meet the requirements set out in *O'Dell.*

Our holding does not deprive Seago of other legal remedies. Seago is free to raise his sixth amendment claims and support them with evidence outside the trial record in a collateral attack on his judgment of conviction. In contrast to the limited time period within which a motion for new trial must be made pursuant to Rule 33, there is no time limit imposed on post-conviction proceedings under 28 U.S.C. § 2255.

### B.

Seago next argues that the verdict should be set aside and a new trial should be granted because the trial judge made improper comments and gestures which denied him a fair trial. Seago contends that, during Seago's testimony, the district judge made gestures indicating disbelief. The government counters that any remarks which may have been heard did not influence the jury's verdict and any potential influence was cured by the jury charge. Our review of the record supports the government's position.

■ The judge made two of the contested comments when the jury was not present. The first exchange was in response to an objection that the district judge overruled. The district judge stated the following to defense counsel: "[t]hat was one time I restrained my shock and utter disbelief [at] that astonishing act of yours to parade over there and put a mantel of innocence on your client from this crime he committed...." Joint Appendix at 122. The district judge subsequently indicated that it should have used the word "alleged" to modify "crime." On another occasion, the district judge overruled defense counsel's objection to a witness' testimony that the witness discovered what he believed to be a "check kiting scheme." Defense counsel objected on the basis that use of the term constituted a legal conclusion. The district judge stated that "the government's theory is that it's a check kiting scheme. And it sure looks like it was according to the government's proof." In response to the objection, however, the trial judge did not permit the government to use the term "check kiting scheme" in its closing argument before the jury. Because the jury was absent on these two occasions, the trial court's remarks could not have influenced their verdict. We, therefore, find Seago's claims regarding these statements meritless.

■ The following exchange gave rise to the next claim that the district court's comments improperly influenced the jury's verdict:

A: It is my understanding that everything from First American was sent to Signal Capital.

Q: Without regard to whether they were entitled to them or not. You just sent it to them to pay down on this thing and pay the revolver off; is that right?

Mr. Alexander [the government's attorney]: Your Honor, I interpose an objec-

tion. He stated she understood that, which indicates to me that she doesn't know other than what somebody told her.

The Court: *I agree that if somebody else did it and she is just nodding and you tell her what to say, I don't think that is evidence.*

Joint Appendix at 89 (Testimony of Sandra Perkins) (emphasis added). Seago argues that the judge's comments implying that one of the government's witnesses on cross-examination was simply agreeing with the defense attorney impeached the witness' credibility. We conclude that the district court's comments properly clarified the legal context in which the witness' testimony should be considered. Moreover, any possible prejudice to the defendant was cured by the jury charge.

It is the trial judge's responsibility to conduct a trial in an orderly manner with the goal of "eliciting the truth and attaining justice between the parties." *United States v. Slone*, 833 F.2d 595, 597 (6th Cir.1987). We note that every intrusion into a trial made by a presiding judge holds the potential for creating prejudice. *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir.1979). The trial judge's interjection into the trial is nevertheless common and proper when there is a need for clarification in a lengthy or complex trial, when the witness proffers incredible testimony that is not adequately probed by counsel, or when the witness has become confused. *Id.* In addition, "[a] federal judge may analyze the evidence, comment upon it, and express his [or her] views with regard to the trial testimony of the witnesses. [The trial judge] may advise the jury in respect of facts, but the decision of issues of fact must be fairly left to the jury." *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933), *overruled on other grounds, Murphy v. Wa-*

*terfront Com. of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). When commenting on the evidence the trial judge must take great care to avoid undue prejudice of the jury. *United States v. Martin*, 740 F.2d 1352, 1358 (6th Cir.1984). In so doing, the trial judge is required to exhibit "impartiality in demeanor as well as in actions." *United States v. Frazier*, 584 F.2d 790, 794 (6th Cir.1978).

Our review of the record indicates that the district judge's comments merely clarified for the jury what portion of the witness' comments should be considered as evidence for fact finding purposes. The judge did not usurp the jury's fact finding role.[5] In his attempt to carefully delineate that portion of the witness' testimony which should be considered by the jury, the district judge commented on the evidence in an impartial manner. Seago's arguments to the contrary are meritless.

 Seago also contends that the district judge made gestures during Seago's testimony, giving the jury the impression that Seago's testimony was not credible. To support his contention, Seago produced affidavits of his wife and friends who attended the trial. The affiants interpreted the district judge's gestures to indicate his disbelief in Seago's testimony. In reviewing this allegation, the district court considered the credibility of the affiants based on their relationship to Seago, the fact that the affidavits were largely not individualized and the fact that Seago's trial counsel did not object to the conduct at trial, despite numerous other objections throughout the trial. The district court found that these allegations were not timely and properly raised, nor did they present a substantial question of law or fact likely to result in reversal. Joint Appendix at 38, 39. The district court, therefore, concluded that an inquiry of the jury was not warranted. *Id.* at 38. In the alternative, the

---

**5.** To guarantee that the jury was not improperly influenced by the Court's comments, the trial judge issued the following jury instructions:

You should not show prejudice against the client because the attorney has made objections upon allowing testimony or other evidence to be introduced over the objection of

an attorney, the Court does not, unless expressly stated, indicate any opinion as to the weight or effect of such evidence.

*As stated before, the jurors are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.*

Joint Appendix at 254 (emphasis added).

district court determined that its final charge to the jury cured any potential prejudice.

The trial judge's impartial demeanor is important to facilitate the jury's evaluation of the evidence to render a verdict untainted by bias. We reiterate that the trial judge's comments and actions must be impartial; "the trial court may not do by indirection that which it may not do directly...." *Billeci v. United States*, 184 F.2d 394, 401 (D.C.Cir.1950). Each judge brings to the bench his or her unique character and mannerisms. Nevertheless, the trial judge must be vigilant in preventing gestures from indicating his or her view on the guilt or innocence of the defendant. *United States v. Nobel*, 696 F.2d 231, 237 (3d Cir.1982), *cert. denied*, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983).

Unlike the review of comments on the record which lend themselves to reliable interpretation, the review of nonverbal gestures which are not reflected in the record invites speculation. We, therefore, look favorably upon the D.C. Circuit's instructions regarding the most suitable manner for preserving an objection to the trial court's gestures and demeanor for appellate review. *Billeci*, 184 F.2d at 401 (stating "that if the trial judge conducts himself erroneously to the detriment of the defendant[ ] it is incumbent upon counsel to record such action at the time."). The *Billeci* court instructs:

> [I]f the intonations and gestures of a trial judge are erroneously detrimental to a defendant in a criminal case[,] it is the duty of counsel to record fully and accurately, at the time and on the record, although not in the hearing of the jury, what has transpired.... If the representations then made by counsel are not accurate, the court may say so. But if there is a serious question as to whether the jury may have derived some unintended meaning or have been likely to infer erroneously from the gestures and intonations of the judge, [the court] should emphatically instruct them so as to remove any possible erroneous impression from their minds.

*Billeci*, 184 F.2d at 402. As Seago's counsel did not object at trial and appellate counsel did not argue that objections would have exacerbated the situation, this Court's review is limited to the plain error standard. *Slone*, 833 F.2d at 598; *accord Nobel*, 696 F.2d at 237 ("A strict standard of review is particularly appropriate [where] ... an objection would have permitted the trial court to correct any impression that might have been inadvertently conveyed to the jury by [the district judge's] prior tone of voice."). Plain errors are those which should have been apparent to the trial judge without objection, or which strike at the fundamental fairness, honesty or public reputation of the trial. *United States v. Causey*, 834 F.2d 1277, 1281 (6th Cir.1987), *cert. denied*, 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988).

The record is devoid of evidence supporting Seago's claim that the trial judge's alleged gestures substantially influenced the jury in favor of the government and against Seago. We find that any potential prejudice was minimal and, therefore, cured by the trial judge's charge to the jury. We find two portions of the jury charge particularly relevant:

> Remember at all times, that you as jurors are at liberty to disregard all comments or questions of the Court about the facts in arriving at your own findings as to the facts.

> \* \* \* \* \* \*

> You as jurors are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified and every matter in the evidence which tends to show whether a witness is worthy of belief. Consider each of the witnesses [sic] intelligence, motive, and state of mind and demeanor while on the stand. Consider the witnesses [sic] ability to observe the matters as to which he has testified and whether he impresses you as having an accurate recollection of these matters. Consider also any relation each witness may have to either side

of the case and the extent to which, if at all, each witness is supported or contradicted by other evidence in the case. Joint Appendix at 253, 255. The jury instructions illustrate the great care taken by the trial court to emphasize the jury's responsibility as fact finder. Moreover, we find that the minimal prejudice that may have resulted was rendered harmless by the overwhelming proof of Seago's guilt. *See United States v. Robinson,* 635 F.2d 981, 985 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981).

### C.

Seago next assigns error to the district judge's exclusion of data, reports and records regarding the financial condition of Mid Con, prepared by a First American employee. The parties had stipulated to the fact that they were business records containing financial analysis, however the government reserved its right to object to their relevancy. We conclude that the trial judge did not abuse his discretion in excluding these documents.

■ The trial court's determinations of admissibility and relevancy depend on the exercise of sound judgment within the context of the entire trial. *United States v. Stull,* 743 F.2d 439, 445 (6th Cir.1984), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). The trial court's determination should not be disturbed absent a clear abuse of discretion. *Id.*

■ Seago sought to introduce the documents to show the "information available to First American Bank and [First America's] knowledge of the workings [and] ... the financial condition of ... Mid–Continent Systems ..." Joint Appendix at 108. Seago reasoned that First American's knowledge of Mid Con's financial condition precluded a finding that Seago defrauded them. The government objected to their relevancy. *Id.* The district court found the stipulated authentication inadequate. The district judge raised the issue of the records' trustworthiness and, in a bench conference, asked defense counsel why the preparer of the records was not a witness. Joint Appendix at 117. Throughout the colloquy, the government maintained its objection based on relevance. The district court ruled that the documents could be tendered in the absence of the jury to try to show that the witness was familiar with them or acted in a significant manner in response to it. Seago now contends that the district court abused its discretion in excluding these business records because they satisfied the requirements of Fed.R. Evid. 803(6).[6]

The financial condition of Mid Con was not probative of the issue of whether or not Mid Con was conducting a scheme to defraud First American and Signal. The proffered documents contained no reference to the existence or nonexistence of zero-balance accounts. We conclude that it was not an abuse of discretion to exclude the document. The most appropriate basis for exclusion was the lack of relevance rather than the lack of trustworthiness.

■ Seago also contends that the district court committed reversible error by refusing to admit Mid Con's 1985–86 consolidated Audited Financial Statement. The government objected to the document's relevance, arguing that the financial statement for 1985–86 was not relevant to a scheme in 1987. Sandra Perkins testified to Bessemer's alleged $6 million debt to Mid Con using the 1985–86 financial statement although it was not admitted. Thus, in this instance, the potential harm from its exclusion was eliminated. *See Stull,* 743

---

**6.** Rule 803 provides, in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(6) A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

F.2d at 445 (where the essence of the desired testimony was introduced, the potential harm from exclusion is eliminated). Seago has failed to satisfy his burden of showing how he was prejudiced by the exclusion of these documents. We, therefore, hold that the district court did not commit reversible error in its evidentiary rulings.

### IV.

After careful review of the record, we find no errors which warrant reversal. Accordingly, we AFFIRM the judgment and sentencing order entered by the Honorable Robert M. McRae, Senior United States District Judge for the Western District of Tennessee.