**UNITED STATES of America Petitioner–Appellee,**

v.

**Dean JOHNSON, Defendant–Appellant.**

No. 00–1773.

United States Court of Appeals, Sixth Circuit.

Dec. 17, 2001.

Before KEITH, NORRIS, and MOORE, Circuit Judges.

PER CURIAM.

Dean Johnson (the "Defendant") appeals a jury verdict finding him guilty of one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), and 1956(h) and one count of attempting to cause a domestic financial institution to file a false currency transaction report in violation of 31 U.S.C. §§ 5313 and 5324. For the reasons set forth below, we AFFIRM the jury's verdict.

## I. BACKGROUND

Defendant was indicted by a federal grand jury of conspiracy to launder monetary instruments and attempting to cause a domestic financial institution to file a false currency transaction report. These charges arose out of a sequence of transactions conducted on September 23 and 24, 1997, at the Comerica branch office managed by the Defendant. The Defendant was charged with laundering $110,010 in cash through the bank with the intent to disguise the true ownership of the money so as to avoid filing the applicable federal currency transaction report ("CTR") concerning the cash transaction. In addition, the Defendant was charged with attempting to cause Comerica Bank to file a false CTR with respect to the $110,010.

Darryl McConnell ("McConnell"), an associate of one of the co-defendants (and co-conspirator), John Bryant ("Bryant"), testified during the trial. The government elicited testimony from McConnell, which established that the $110,010 was drug money that belonged to Bryant, a convicted drug trafficker. Bryant's other associates also testified that Bryant headed a drug organization that brought hundreds of kilograms of cocaine and close to a thousand kilograms of marijuana from California for distribution in the Detroit area.

The government also elicited testimony that in the summer of 1997, Bryant decided to use some of the proceeds of his drug trade to purchase a home located in Clarkston, Michigan and wanted to put $110,000 as down payment towards the purchase of

the property. According to McConnell's testimony, Bryant needed a cashier's check in that sum because Bryant was concerned that if he tendered the sum in cash he would need "to find a way to account for how he came up with the down payment." McConnell testified that Saunders Dorsey ("Dorsey"), Bryant's attorney, agreed to find Bryant a nominee in whose name Bryant could deposit the cash into a bank account in order to conceal the true source and ownership of the money.

On September 23, 1997, according to McConnell's testimony, he and Bryant brought approximately $125,000 in cash to Dorsey's office. Also present in Dorsey's office that day was Joseph Hudson ("Hudson"), the nominee in whose name the cash was to be deposited. Hudson was also one of Dorsey's clients. McConnell further testified that on the same day, the Defendant attended a closed-door meeting at Dorsey's office with Bryant, Dorsey, and Hudson. According to McConnell, after the four had finished the meeting, Bryant instructed McConnell to drive Hudson [1] over to the Comerica branch office managed by the Defendant so that Hudson could sign some paperwork. According to McConnell's testimony, several days later, Bryant showed him a cashier's check in the amount of $110,000 and stated that Bryant knew Dorsey was "dirty" because instead of evenly dividing $15,000 (the extra cash from the original sum of $125,000

after accounting for the deposit of $110,010) between Hudson and the Defendant, Dorsey gave the Defendant and Hudson approximately $1,500 each and kept the remainder.

In addition to McConnell's testimony, a review of the bank records of the Comerica Bank branch managed by the Defendant confirms that on September 23, 1997, the Defendant opened an account for Hudson in the name of "Joseph Hudson, Jr." As part of the account opening, the Defendant filled out a signature card for Hudson, which contained the following incorrect information: name, date of birth, social security number, and driver's license number.[2] The bank records reveal that the Defendant then processed a deposit in the amount of $110,010 in cash into Hudson's account. The government elicited testimony that the Defendant then instructed a bank teller (not a party to the conspiracy) to prepare a CTR for the $110,010 cash deposited in the name of Joseph Hudson, Jr., using the incorrect information that the Defendant had recorded on the signature card.

Comerica Bank records also confirm that a day later, on September 24, 1997, the Defendant authorized[3] the withdrawal of $110,000 from Hudson's account in the form of a Comerica Bank cashier's check made payable to Bryant. The bank records show that less than an hour later, the Defendant signed off on the deposit of the

---

1. Although there is conflicting testimony on who drove Hudson to the bank, the resolution of the conflict is not germane to our disposition of this case.

2. We find that the record does not support the Defendant's contention that these mistakes were merely inadvertent transpositional errors.

3. The Defendant testified that Hudson called him early on the morning of September 24, 1997, and instructed him to prepare a cash-

ier's check payable to Bryant in the amount of $110,000. On this point, Hudson testified to know nothing about the $110,010 deposited the previous day nor the phone call requesting that a cashier's check be drawn on the account. Hudson further testified that he inquired from both the Defendant and Dorsey but received no definitive answers regarding the $110,010 figure on a bank statement he received in the mail. According to Hudson, he had simply deposited the minimum amount required ($50) to open the bank account.

$110,000 cashier's check into Bryant's account and authorized the issuance of a second Comerica Bank cashier's check, also in the amount of $110,000, again payable to Bryant. According to the testimony at trial, because no "cash" was presented to purchase the second cashier's check issued on September 24, 1997, no CTR was filed by Comerica Bank in Bryant's name. Thus, Bryant, with the Defendant's help, was able to move $110,010 through the bank without having any reports filed linking Bryant to the cash. The government also adduced evidence that several days later, Bryant tendered the second $110,000 cashier's check as part of his purchase of the property located in Springfield Township, Michigan.

The Defendant contended that he engaged in nothing illegal in (i) opening the account for Hudson; (ii) relying on information obtained from Hudson to file a CTR, and (iii) authorizing the issuance of two cashier's checks in connection with the cash contained, first in Hudson's account and then later, in Bryant's account. According to the Defendant, these were all routine actions performed as a bank employee, and thus, cannot be equated with an intent to commit money laundering or an intent to file a false CTR. The Defendant testified that he had known Dorsey for years and had handled large monetary transactions for the attorney in connection with his legal practice specializing in medical malpractice. According to the Defendant, he first met Hudson while making a courtesy call at Dorsey's office. He then drove Hudson to the Comerica branch office where Hudson deposited the $110,000. The Defendant testified that he instructed the teller to file a CTR. The Defendant stated that in having the CTR prepared,

he used the information supplied by Hudson and later corrected the information after searching the bank's records for Hudson's addresses. The Defendant testified that he felt comfortable assisting Hudson even though he had just met him because he had done numerous transactions for Hudson's brother as well as Dorsey, who introduced him. Furthermore, the Defendant stated that he believed that Hudson was employed in concert promotion, a cash business, which would be consistent with the type of transaction the Defendant was conducting on September 23, 1997.[4]

## II. ANALYSIS

We review the Defendant's claim that there was insufficient evidence to support his convictions to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any *rational* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in the original). As we review the Defendant's claim of insufficient proof, however, we may not "weigh the evidence, consider the credibility of the witnesses of substitute our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir.1993). This Court "will reverse a judgment for insufficiency of evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole, and . . . this rule applies whether the evidence is direct or wholly circumstantial." *United States v. Stone*, 748 F.2d 361, 363 (6th Cir.1984).

---

4. The Defendant's testimony on this point is inconsistent with the fact that in preparing Hudson's signature card, the Defendant listed only the words "Metro Fencing" for Hudson's employment and made no reference to concert promotion or video production.

## A. The Conspiracy Conviction

■ The Defendant was charged and convicted of one count of conspiring with Bryant and others to launder $110,010 in cash with the intent to disguise the nature, source and ownership of the money and with the intent to avoid a transaction reporting requirement. The essential elements of a conspiracy are: (i) an agreement by two or more persons to violate the law; (ii) knowledge that each conspirator knew of and intended to join the conspiracy; and (iii) participation in the conspiracy. *See, e.g., United States v. Elder,* 90 F.3d 1110, 1120 (6th Cir.1996). The government is not required to prove participation in a conspiracy through direct evidence, but may suggest the inference that a common purpose existed based upon circumstantial evidence. *United States v. Avery,* 128 F.3d 966, 971 (6th Cir.1997). In addition, it is not necessary to show that the defendant knew the full extent of the enterprise to sustain a conspiracy conviction. *United States v. Ross,* 190 F.3d 446, 449 (6th Cir.), *cert. denied,* 528 U.S. 1033, 120 S.Ct. 559, 145 L.Ed.2d 434 (1999).

In the case at bar, we hold that the government sufficiently established that the Defendant was part of a conspiracy with Bryant, Dorsey, and the designated nominee, Hudson, to launder money, and that the Defendant was financially compensated therefor. The government adduced testimonial evidence that on September 23, 1997, the Defendant met with Bryant, Dorsey, and Hudson behind closed doors at Dorsey's office. The government produced evidence that shortly after the meeting, Hudson opened a new bank account and $110,010 was deposited into the account at the branch where the Defendant worked. The unlawful nature of the meeting was highlighted by the fact that the Defendant lied to an IRS agent (investigating activities related to Bryant) about attending the meeting and events related thereto. The Defendant also lied about knowing Hudson prior to Hudson's deposit of the cash. First, the Defendant claimed that on the day in question, Hudson simply walked off the street and deposited the money. Later, at trial, he admitted to having been at Dorsey's office on September 23, 1997 and that he had met Hudson while paying a courtesy call to Dorsey's office after which he drove Hudson to the bank to open the bank account and deposit the cash. In addition, the Defendant denied ever meeting Bryant at Dorsey's office. We find that there was sufficient evidence on the record from which a rational trier of fact could find all the essential elements of a money laundering conspiracy beyond a reasonable doubt.

We find to be without merit the Defendant's contention that there was insufficient evidence of a money laundering conspiracy. The Defendant's contention centers on the fact that none of the conspirators themselves came forward and expressly acknowledged the formation of a conspiracy. This contention, however, has no support in the law. The law on conspiracy clearly recognizes that it is equally permissible to prove the existence of a conspiracy through joint actions of the participants as it is with direct admissions. *See, e.g., United States v. Avery,* 128 F.3d 966, 971 (6th Cir.1997). Furthermore, it is not necessary to show that the Defendant knew the full extent of the enterprise to sustain a conspiracy conviction. *United States v. Ross,* 190 F.3d 446, 449 (6th Cir.) *cert. denied,* 528 U.S. 1033, 120 S.Ct. 559, 145 L.Ed.2d 434 (1999). Here, from the evidence adduced of the concerted actions of Bryant, Dorsey, Hudson and the Defendant, the existence of a conspiratorial agreement could reasonably be inferred. It is of no import that none of the conspirators testified to an agreement, express or tacit; a

jury may properly infer the existence of one from the circumstantial evidence before it.

## B. Specific Intent to Commit the Charged Offenses

■ We also do not agree with the Defendant's argument that there is insufficient evidence to support a finding that the Defendant possessed the requisite specific intent to commit the charged offenses. To convict a defendant of money laundering under 18 U.S.C. §§ 1956(a)(1)(B)(i) or 1956(a)(1)(B)(ii), the government must prove beyond a reasonable doubt that the defendant (i) conducted a financial transaction that involved the proceeds of unlawful activity; (ii) knew the property involved was proceeds of unlawful activity; and (iii) knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, the source, the ownership or the control of the proceeds of specified unlawful activity. *See, e.g., United States v. McGahee,* 257 F.3d 520, 526 (6th Cir. 2001); *United States v. Beddow,* 957 F.2d 1330, 1334 (6th Cir.1992). The government is not required to show that the defendant knew the precise nature of the unlawful activity as long as the government shows that (i) the defendant knew the money was from some unlawful activity, and (ii) further shows that the unlawful activity at issue was a felony under state, foreign, or federal law. *United States v. Hill,* 167 F.3d 1055, 1066–67 (6th Cir.), *cert. denied,* 528 U.S. 872, 120 S.Ct. 175, 145 L.Ed.2d 148 (1999). The "knowledge prong" of the money laundering statute can be proven by direct or circumstantial evidence. *United States v. Moss,* 9 F.3d 543, 551–52 (6th Cir.1993); *see also United States v. Scruggs,* 549 F.2d 1097, 1104 (6th Cir.) ("Proof of knowledge, like proof of intent, is rarely established by direct evidence ... circumstantial evidence [and] independent facts from which an inference of the ultimate fact may rationally be drawn in light of common experience can be sufficient to support a jury's determination"), *cert. denied.* 434 U.S. 824, 98 S.Ct. 70, 54 L.Ed.2d 81 (1977).

In *United States v. Marshall,* 248 F.3d 525 (6th Cir.2001), we recently adopted the analysis and holding of *United States v. Garcia–Emanuel,* 14 F.3d 1469 (10th Cir. 1994) as the appropriate rule to apply to the intent element of a money laundering charge. In *Garcia–Emanuel,* the Tenth Circuit recognized that a certain type of evidence is required for the government to prove the element of intent to conceal in a money laundering charge. *Garcia–Emanuel,* 14 F.3d at 1474. In *Garcia–Emanuel,* the court declared

[A] variety of types of evidence have been cited by this and other circuits as supportive of evidence of intent to disguise or conceal. They include among others, statement by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves culminating in the transaction; or expert testimony on practices of criminals.

Id. at 1475–76 (citations omitted).

In the instant case, contrary to the Defendant's contention, we find that his conduct adequately supported the jury's determination that he possessed both the intent to conceal the source of the cash and the intent to avoid filing a CTR as required by the applicable federal law. There was testimony that the Defendant lied about attending a meeting at which the other co-conspirators were present.

Furthermore, there is evidence that shortly after the meeting, the Defendant authorized the opening of an account for Hudson in an attempt to use a third party to conceal the real owner of the funds at issue. There was testimony that the structure of the financial transaction—whereby two cashier's checks were issued in quick succession in the same amount to the same person—was unusual. The record also establishes that the Defendant caused to be filed a CTR containing material misstatements and omissions. Thus, by arranging for the transactions as described, the Defendant was able to move the $110,010 through a nominee account and back out in the form of a cashier's check made payable to Bryant while concealing the fact that Bryant was the source and the owner of the cash. To further insulate the transaction from detection or examination by law enforcement, the Defendant arranged for Comerica to file a CTR containing incorrect information. From the foregoing, we hold that there is sufficient evidence from which a rational trier of fact could have found the elements of conspiracy to launder money and file a false CTR beyond a reasonable doubt.

We find that the Defendant's reliance on *United States v. McDougald*, 990 F.2d 259 (6th Cir.1993) is misplaced. The Defendant claims that Bryant, a central co-conspirator in the case at bar, had other legitimate businesses and thus, the $110,010 with which the Defendant conducted the financial transactions at issue could have been from those businesses. The Defendant, however, fails to note that unlike the case in *McDougald*, the government in the present case presented substantial evidence from which one could reasonably conclude that the Defendant's co-conspirator was involved in the drug trade and that the money at issue was more likely than not a proceed of that trade. The Defendant's assertions that Bryant had legiti-

mate businesses from which the cash at issue may have originated do not necessitate a different result in the instant case. First, a drug dealer with other sources of income is not thereby insulated from money laundering charges. *McDougald*, 990 F.2d at 265 (Boggs, J., dissenting). In the present case, we find that the government has sufficiently proved that Bryant was a drug dealer with substantial income from drugs. Second, the government is not required to prove that the drug dealer has no other income. *United States v. Jackson*, 935 F.2d 832, 839–41 (7th Cir.1991). In any event, if the money at issue here had been from one of these other legitimate businesses as claimed by the Defendant, it is unlikely that the Defendant would have gone to great lengths to conceal its source; he would simply have deposited the money in Bryant's name *ab initio*.

Finally, we find the Defendant's contention that he lacked knowledge of the money being the proceeds of illegal activity to be without merit. The circumstantial evidence regarding the Defendant's guilty knowledge is very strong and thus more hospitable to an interpretation consistent with guilt than with the Defendant's theory of innocence.

## C. District Court's Evidentiary Rulings.

We hold that the district court did not abuse its discretion regarding its evidentiary rulings. The trial court's determinations of relevance and admissibility depend on the exercise of sound judgment within the context of the entire trial. *United States v. Seago*, 930 F.2d 482, 494 (6th Cir.1991); *United States v. Stull*, 743 F.2d 439, 445 (6th Cir.1984), *cert. denied*, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). Absent a clear abuse of discretion, the trial court's determination should not be disturbed. *Stull*, 743 F.2d at 445.

In *United States v. Medina,* 992 F.2d 573, 587 (6th Cir.1993), *cert. denied,* 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994), we stated that a jury will be presumed capable of sorting out evidence applicable to each defendant and rendering its verdict accordingly. We find to be meritless the Defendant's contention that the government's presentation of evidence concerning Bryant, a co-conspirator (and also a co-defendant) was done for no other reason than to inflame the jury. Contrary to the Defendant's assertions, the government introduced this evidence because as part of the charged offenses, the government is required to prove that the transactions conducted by the Defendant involved proceeds of specified unlawful activity; here, proceeds of a drug distribution conspiracy. *See United States v. Bencs,* 28 F.3d 555, 562 (6th Cir.1994) (holding that to establish money laundering, the government must show that the transaction involved proceeds of specified unlawful activity), *cert denied,* 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995). Consequently, based on the applicable standard of review, we find that the district court did not abuse its discretion in allowing the government to introduce evidence aimed at establishing that the funds with which the Defendant transacted did, in fact, represent the proceeds of Bryant's drug trafficking business, a specified unlawful activity under the money laundering statute. We find this especially to be true in light of Defendant's attempts to raise the inference that the money in question may have come from non-drug sources.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the verdict of the jury.