UNITED STATES of America,
Plaintiff–Appellee,

v.

Ernest Glenn PIERCE, Sr. (94–5841) and
Brian Grayson Tackett (94–6234),
Defendants–Appellants.

Nos. 94–5841, 94–6234.

United States Court of Appeals,
Sixth Circuit.

Argued May 8, 1995.

Decided Aug. 18, 1995.

Rehearing Denied in No. 94–5841
Oct. 10, 1995.

Rehearing and Suggestion for
Rehearing En Banc Denied in
No. 94–6234 Oct. 20, 1995.

820

Terry Cushing, Asst. U.S. Atty. (briefed), John L. Caudill, Asst. U.S. Atty. (argued), Louisville, KY, for plaintiff-appellee.

R. Brad Coffman (argued and briefed), Coffman & Beck, Bowling Green, KY, for defendant-appellant Ernest Glenn Pierce.

Samuel Manly (argued and briefed), Law Offices of Samuel Manly, Louisville, KY, for defendant-appellant Brian Grayson Tackett.

Before: BOGGS and NORRIS, Circuit Judges; SPIEGEL, District Judge.[*]

S. ARTHUR SPIEGEL, District Judge.

On December 6, 1991, members of the Ku Klux Klan ("Klan") burned Barren River Baptist Church ("Church") to the ground. After a long and heated trial, the jury convicted Ernest Pierce of solicitation and conspiracy to commit arson and Brian Tackett of arson, conspiracy, carrying a firearm in relation to a violent crime, and interstate transportation of a stolen motor vehicle.

The district court provided the Defendants with every possible protection in what became a very complex and difficult trial, and we are favored with Judge Heyburn's exhaustive opinion denying the Defendant's post-trial motions. *United States v. Pierce,* Cr–92–15–BG(H) (W.D.Ky. April 20, 1994). After reviewing the myriad of issues Tackett and Pierce presented on appeal, we AFFIRM the district court.

---

[*] The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

## I. Background

In the fall of 1991, Larry Craig became pastor of the Barren River Baptist Church. Prior to becoming pastor, Craig was the editor of the Green River Republican, a weekly newspaper in Morgantown, Kentucky, and a vocal critic of the Klan. As pastor, Craig remained a vocal critic of the Klan.

Ernest Pierce held the Imperial Wizard position (first in command) of the local chapter of the Klan and Brian Tackett held the Silent Grand Dragon position (second in command). At trial, the government alleged that Pierce wanted the Church burned because the Church's highly-visible pastor had harshly and repeatedly criticized the actions of the Klan.

The government established that Pierce had economic authority over Tackett, which made Tackett a natural candidate for executing Pierce's designs. Some evidence of personal affinity between Pierce and Tackett existed, but most witnesses described their relationship as a "business" relationship rather than a friendship. Trafficking stolen goods formed the basis for their "business" relationship. Tackett would steal items, such as farm equipment, and then take them to Pierce, who would fence the goods. The government established that Tackett's economic interests made it imperative that he remain in Pierce's good graces.

Many individuals testified at trial. Kim Patton and Jerry Gann, testifying on behalf of the government, acknowledged that they were members of the conspiracy and admitted to participating in the arson. Gann pleaded guilty prior to trial. The government never indicted Patton. They provided most of the testimony describing the arson itself.

### A. The Government's Evidence

Gann testified that in the early evening of December 5, 1991, he stole a white sports car from a local dealer. After stealing the car, Gann drove to Tackett's farm, where he

picked up Tackett and Patton. The three left the Tackett farm to engage in a night of drinking and joy-riding. They drove to Gann's friend's house in Franklin, Kentucky, to pick up a license plate for the car. Afterwards, their excursion led them across the Tennessee border, where Tackett apparently got in a minor accident. Finally, they returned to Bowling Green, Kentucky, and eventually stopped at Pierce's house. After leaving Pierce's house, they proceeded to Tackett's farm, where they picked up four one gallon cans of Coleman fuel.

Tackett, Gann, and Patton then drove to the Church in the early morning hours of December 6, 1991. Tackett owned a handgun, which he apparently carried throughout the night's events. Tackett and Gann took the Coleman fuel out of the trunk and proceeded to set fire to the Church. The trio then left and again visited Pierce's house, where Tackett wrecked the car for the second time that evening.

Pierce admitted at trial that Tackett, Gann, and Patton had visited him in the early morning hours of December 6. Upon arriving at Pierce's house, Tackett told Pierce "It's done" and Pierce apparently nodded in reply. Later that day, Tackett told Patton and Gann he had burned the Church as a favor to Pierce.

A few days later Tackett, Patton and Gann all attended a Klan meeting at Pierce's house. During the meeting, Pierce read an article about the Church burning. He then threw down the paper and stated, "Thanks, that's what I wanted done."[1]

## B. The Defense

At trial, both Defendants "vigorously opposed the government's allegations." (District Court Order, J.A. at 303). The Defendants offered their own version of what occurred, and attacked the credibility of the prosecution's main witnesses, Patton and Gann.

Pierce took the stand and denied responsibility for the burning of the Church. Several witnesses testified as to his reputation for peacefulness and testified that he did not

have a grudge against the Church or its pastor. While Pierce conceded that Tackett had come to his home on the early morning hours of December 6, he denied that it had anything to do with the arson. He also denied fencing stolen equipment for Tackett. Pierce claimed that Tackett implicated him in the arson because Pierce's son had "whipped" Tackett in a fight a few days earlier.

Tackett presented an alibi at trial. Several witnesses testified that he was in Ohio the weekend of the arson watching his brother's football game.

Tackett testified and admitted that he had engaged in criminal activity in the past. Tackett stated, however, that Pierce never fenced goods for him. Tackett blamed Patton and Gann for the arson, and stated that Patton, a former girlfriend, was setting him up. Tackett further stated that Pierce was also part of the plan to set him up.

## C. The Jury's Verdict

The jury found both Defendants guilty. The Defendants now contest the sufficiency of the evidence and many of the judge's legal findings at trial.

The trial lasted ten days, and the transcribed record is 18 volumes. The facts were hotly contested, but upon review, we find that the district court was careful, fair, and correct, and we therefore affirm the decision below.

## II. Joint Issues

### A. Motion for New Trial

■ Both Defendants have moved for a new trial based upon what is alleged to be newly discovered evidence. The decision whether to grant a new trial is left to the sound discretion of the district court, and this Court will not reverse absent a clear abuse of discretion. *United States v. Seago*, 930 F.2d 482, 488 (6th Cir.1991). The Defendants bear the burden of proving that a new trial should be granted. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir.1994) (citing *Seago*, 930 F.2d at 488).

---

1. The District Judge called these "the most im- portant words of the trial." (J.A. at 301.)

In order to obtain a trial on newly discovered evidence grounds, the defendants must establish that: (1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence likely would produce an acquittal.

*Id.* (citing *Seago*, 930 F.2d at 488).

A few days after the jury returned its verdict, the Kentucky Ku Klux Klan leader, Chris Conner, confessed publicly that he, not Pierce, had ordered the burning of the Church. Both Pierce and Tackett base their motion for a new trial upon this confession.

Chris Conner was not a stranger to this case. In fact, Conner appeared as a character witness for Pierce. Conner testified that the Klan investigated and almost threw out Pierce for his friendships with blacks and the police. Conner also swore he never met Brian Tackett. Throughout his testimony, however, Conner never gave a hint of the information he now claims to possess regarding the burning of the Church. He never told the jury or the court that he could exonerate either or both defendants.

After the conviction, however, Conner suddenly shed his reluctance to speak. Conner explained to the press that he ordered the burning to punish the Church's pastor for his attacks on the Klan. Conner gave many details of how he planned the burning. He even boasted that his plan was so elaborate that it even required him to get married, so that he would have an alibi the night of the arson. David C.L. Bauer and Evans Donnell, *KKK Grand Dragon Says He Ordered Fire*, Bowling Green Daily News, April 7, 1993, at 1A. This part of Conner's scheme misfired. His wedding inexplicably took place the day after the Church burned.

The Magistrate Judge conducted a post-trial hearing on this motion. Here Conner provided even more details. Conner testified that the plot began when two anonymous persons telephoned him to ask whether they could join the Klan. The group agreed to meet in a field near the Church. Conner, knowing they would be discussing illegal activities, ordered that they all wear hoods over their faces for the meeting, so that none of the participants would know the others' identities. At the meeting, Conner told the two that if they wanted to join the Klan, they would have to prove their worth by burning the Church. Conner stressed to the Magistrate Judge that no women were involved.

Then, in a hearing conducted by the district court, Conner offered a completely different account of the events. Conner abandoned the theory of the secret meeting and stated that he contacted Brian Tackett and requested him to burn the church. Conner claims Tackett said no, but recommended Kim Patton and Jerry Gann for the task. Conner claims he followed Tackett's advice and enlisted Patton and Gann in the conspiracy. Both Patton and Gann deny they ever met Conner. Eventually, Conner swore that neither Tackett nor Pierce played a role in the burnings.

The district court found Conner's testimony evasive, inconsistent and implausible. (J.A. at 314.) For example, Conner's final version of the story had Kim Patton involved in the burning, while earlier he had stated that "no girls involved . . . just two guys and me." Furthermore, Conner lied under oath several times, and at trial claimed he never before met Brian Tackett. Finally, Tackett left little doubt about his view of Conner's credibility, stating at trial that Conner is "about as crazy a man as you'll ever meet." (J.A. at 314.)

### 1. Brian Tackett

■ The district court correctly found that Tackett's request for a new trial fails, because Tackett admitted prior knowledge of this evidence.[2] At the post-trial hearing, Tackett stated, "I was contacted by an individual who told me he had a job to do. I called . . . [and] . . . met Mr. Conners . . . Mr. Conners and I spoke briefly in the field where we parked . . . Mr. Conners said he

---

**2.** It also fails on the fourth requirement that the evidence would likely produce an acquittal, discussed below under the Pierce section.

wanted to burn the church down. I said ... I don't do that type of thing." (J.A. at 1085–86.) If Conner's post-trial tale was true, then it revealed nothing new to Tackett but simply confirmed what Tackett allegedly had known for over a year. At trial, Tackett could have disclosed Conner's actions, and exculpated himself when he took the stand in his own defense. Instead, he chose to swear that he knew nothing about the fire stating, "I can't prove nothing. I don't know what they did."

Tackett may regret that he did not reveal this story at trial, but he cannot now claim this is newly discovered evidence. Evidence is not newly discovered when it is necessarily known by the defendant at the time of trial. *Cf. United States v. Seago,* 930 F.2d 482, 489 (6th Cir.1991) ("Where facts alleged in support of an ineffective assistance of counsel claim were known by the defendant at the time of trial, the defendant failed to satisfy the newly discovered evidence requirement of Rule 33."). Therefore, Tackett fails to meet the necessary requirements of newly discovered evidence to justify a new trial.

### 2. Ernest Pierce

■ Pierce arguably satisfies the first three requirements for obtaining a new trial on newly discovered evidence grounds. Nothing in either Pierce's testimony or Conner's confession suggests that Pierce should have known of Conner's asserted role in the arson. Therefore, Conner's confession may be considered newly discovered evidence with respect to Pierce. It is questionable whether he could have discovered it during or previous to trial. Furthermore, Conner's confession bore directly on Pierce's guilt or innocence. Therefore, it appears that Pierce could meet the first three factors.

The district court, however, correctly concluded that Conner's confession would not persuade a jury to acquit Pierce if the case were retried. The district court concluded that a jury would probably reject *all* of Conner's testimony because it is "so infested with untruths, deception and obvious bias." (J.A. at 316.) Conner's numerous stories detract from his credibility. Armed with Conner's many stories, the government would be able to impeach Conner's testimony, rendering it useless.

Moreover, the jury would have to accept Conner's testimony over that of the government's witnesses, Patton and Gann. Both Patton and Gann faced heavy impeachment attacks in the first trial, but were implicitly found reliable by the jury. It is very unlikely that a second jury would reject their testimony in favor of one of Conner's many stories. As the district court said, "[t]he remedy of a new trial seems particularly inappropriate when, as here, the newly discovered evidence lacks credibility, conflicts directly with believable testimony, and is offered by a witness who could easily construct a set of facts to leave Pierce out of the conspiracy." (J.A. at 317–18.) *(citing United States v. Barlow,* 693 F.2d 954, 966 (6th Cir.1982) (holding new trial properly denied where newly discovered witness's testimony lacked credibility and where witness could easily construct a set of facts to leave defendant out of the conspiracy)).

The district court held a hearing on this matter and determined the "new evidence" did not merit a new trial. The district court thoroughly investigated the grounds advanced by both Defendants in their motions for a new trial. We agree with the district court that Conner's newest confession does not merit a new trial.

### B. Jury Verdict

■ Next, both Tackett and Pierce argue that the jury's verdict was against the great weight of the evidence, and thus, the district court should have granted their motions for a new trial. When reviewing motions for a new trial, we look to see if the district court abused its discretion. *United States v. Ashworth,* 836 F.2d 260, 266 (6th Cir.1988).

■ A district court in its discretion can overturn a jury's verdict. *Id.* The district court should exercise such discretion only in the extraordinary circumstances where the evidence preponderates heavily against the verdict. *Id.* "The court of appeals, however, does not sit as a *thirteenth juror* to judge the credibility of witnesses. Neither do we reweigh the evidence." *Id.* (emphasis in origi-

**826**

nal). Rather, the Court of Appeals looks to the entire record to determine whether the district court abused its discretion. *Id.*

### 1. Brian Tackett

 Tackett argues that the government did not present enough credible evidence to overcome his alibi, and thus, the district court should have granted him a new trial. The district court is in the best position to determine the credibility of the witnesses, the weight of the evidence and the fairness of the trial. The district court found that both Patton and Gann presented credible testimony, and that at least two credible witnesses documented Tackett's every illegal move.

Tackett's alibi was that he was in Ohio during the blaze. The jury, however, chose to reject his alibi testimony and accept the government's theory instead. The district judge agreed that the government's witnesses were credible, and that Tackett's alibi seemed "staged." "In cases in which we assess the sufficiency of the evidence, we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir.1994) (internal citations omitted). We look instead to the entire record to determine if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 1439 (emphasis in original). After reviewing the record, we find that a rational trier of fact had substantial support to find Tackett guilty beyond a reasonable doubt, and the district court did not abuse its discretion by denying Tackett's motion for a new trial.

### 2. Ernest Pierce

 The district court conceded that "the evidence implicating Defendant Pierce ... was considerably less compelling[.]" (J.A. at 305.) Much of the government's case against Pierce focused on inferences drawn from evidence of Pastor Craig's criticism of the Klan, Pierce's prior criminal dealings with Tackett and Pierce's statement, "Thanks, that's what I wanted done," after Tackett, Patton and Gann burned the Church. Pierce correctly asserts that the jury could have drawn differ-ent inferences from the evidence against him. But, the jury did not make this choice, and the evidence does not dictate that they should have.

The jury convicted Pierce of solicitation and conspiracy to commit arson. "A conspiracy may be inferred from circumstantial evidence that can be reasonably interpreted as participation in the common plan." *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (quoting *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir.1985)). In this case, the record contains ample evidence that Pierce participated in the plan, and solicited Tackett to commit the arson. Therefore, the district court's decision to deny Pierce a new trial was not a clear and manifest abuse of discretion, but instead was supported by the evidence.

### III. Pierce's Issues

### A. Motion for Acquittal

 Pierce argues that the district court should have granted his motion for judgment of acquittal. We review *de novo* a trial court's refusal to grant a motion to acquit. *United States v. Gibson*, 896 F.2d 206, 209 (6th Cir.1990). "The standard is whether the government had introduced evidence sufficient for any rational trier of fact to convict, viewing the evidence and all reasonable inferences in the light most favorable to the government." *Id.* (citing *United States v. Gibson*, 675 F.2d 825, 829 (6th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982)). As discussed *supra,* the jury had sufficient evidence to return a guilty verdict. Therefore, the district court did not err in finding the government met this standard.

### B. Statements of Co–Conspirators

Pierce argues that the district court improperly admitted out-of-court statements made by Tackett. In particular, Pierce claims the district court should not have admitted Tackett's statements that (1) Tackett stole a car in order to do a favor for Pierce, (2) he had to burn a church for Pierce and (3) he burned the Church as a favor to Pierce.

The district court admitted the statements as non-hearsay under Federal Rule of Evidence 801(d)(2)(E). Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

▬▬ In order to admit a statement of a co-conspirator the government must establish (1) that a conspiracy existed, (2) that the defendant was a member of the conspiracy and (3) that the co-conspirator's statements were made in furtherance of the conspiracy. *United States v. Clark*, 18 F.3d 1337, 1341 (6th Cir.1994) (internal citations omitted). The district court must make these determinations under a preponderance of the evidence standard. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). These are factual determinations which we review for clear error. *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir.1992) (en banc).

Pierce argues that Tackett's out-of-court statements were improperly admitted, because the government failed to provide sufficient corroborating evidence independent of the statements to link Pierce to the conspiracy. Pierce correctly asserts that the district court cannot determine whether he was a member of the conspiracy based only upon Tackett's statements.

▬▬ Prior to the adoption of Federal Rule of Evidence 104(a),[3] "proof of a conspiracy required evidence independent of the hearsay statement itself ('the independent evidence rule')." *Clark*, 18 F.3d at 1341. In *Bourjaily*, the Supreme Court determined that the adoption of Rule 104(a) changed "the independent evidence rule." The Supreme Court held that a district court can consider "any evidence whatsoever, bound only by the rules of privilege," to make factual determinations under Rule 104. *Id.* at 178, 107 S.Ct. at 2780. Therefore, a district court can consider out-of-court statements made by anyone, including putative coconspirators, when determining whether a conspiracy existed.

*Id.* While hearsay statements alone may be unreliable to prove a conspiracy, they can become quite probative when corroborated by other evidence. *Id.* at 180, 107 S.Ct. at 2781.

> Even if out-of-court declarations by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case. Courts often act as factfinders, and there is no reason to believe that courts are any less able to properly recognize the probative value of evidence in this particular area.

*Id.* The Supreme Court, however, did not determine whether a district court could base its findings solely on hearsay statements. *Id.* at 181, 107 S.Ct. at 2781–82.

In *Clark*, we held that "absent *some* independent, corroborating evidence of defendant's knowledge of and participation in the conspiracy, the out-of-court statements remain inadmissible." *Clark*, 18 F.3d at 1341–42 (emphasis in original); *see also Bourjaily*, 483 U.S. at 184, 107 S.Ct. at 2783 (Stevens, J., concurring) ("An otherwise inadmissible hearsay statement cannot provide the sole evidentiary support for its own admissibility—it cannot lift itself into admissibility entirely by tugging on its own bootstraps."). "'Some' independent evidence is not merely a scintilla, but rather enough to rebut the presumed unreliability." *Clark*, 18 F.3d at 1342.

▬▬ In this case, the government presented sufficient corroborating evidence to overcome the suspected unreliability of the out-of-court statements. First, Tackett, Patton and Gann all went to Pierce's house both before and after the burning. Second, Pierce is the Imperial Wizard of the Klan, and the Church's pastor repeatedly and openly spoke out against the Klan. Third, Pierce and Tackett had a business-type relationship that revolved around criminal acts. Finally and most importantly, Pierce stated to his alleged co-conspirators "Thanks, that's what I want-

---

**3.** Rule 104(a) provides in pertinent part: "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court. . . . In making its determination it is not bound by the rules of evidence except those with respect to privileges." Fed.R.Evid. 104(a).

ed done" after he read the newspaper article about the burning.

Accordingly, the district court's finding of a conspiracy was not clearly erroneous, and its admission of co-conspirator statements was proper.

## C. Prior Bad Acts

Pierce also claims that the district court erred when it admitted evidence of his prior crimes or bad acts. Federal Rule of Evidence 404(b) permits "[e]vidence of other crimes, wrongs, or acts" if it is probative of "motive, opportunity, intent, preparation [or] plan...."[4] Fed.R.Evid. 404(b).

We review the district court's determination using a three-part standard of review. First, the district court must make a preliminary determination as to whether sufficient evidence exists of the prior act. *United States v. Gessa,* 971 F.2d 1257, 1261 (6th Cir.1992) (*en banc*). This is a factual determination, which we review under a clearly erroneous standard. *Id.* at 1261–62. Second, the district court must determine whether the "other act" allegedly committed by the defendant was admissible as evidence of "motive, intent, preparation, plan...." *Id.* at 1262. This is a legal determination, and thus is subject to *de novo* review. *United States v. Ushery,* 968 F.2d 575, 580 (6th Cir.1992). "Finally, in ruling on the admission of 404(b) evidence, the district court must determine whether the 'other acts' evidence is more unfairly prejudicial than probative, which is governed by an abuse of discretion standard." *Gessa,* 971 F.2d at 1262.

### 1. Evidence of Prior Acts

Pierce claims that there was not sufficient evidence of any alleged prior acts. In *Gessa,* we held that testimony of two witnesses was sufficient to show that a prior act occurred. *Id.* at 1261–62. In the case at bar, two witnesses testified about Pierce's

prior bad acts, and Pierce previously pleaded guilty to a charge of receiving stolen property.

Gary Hale testified that he and Tackett had stolen large volumes of property, including lawn mowers, tractors, and backhoes since they were in the ninth grade. (J.A. at 55455.) After stealing the equipment, Hale and Tackett would often drop it off at Pierce's residence. (J.A. at 540.) Pierce would then pay Tackett, who would share the proceeds with Hale. (J.A. at 545–46.)

Detective Eldon Isenberg testified that Hale approached him and confessed to his involvement in the theft ring. (J.A. at 576.) Specifically, Hale admitted that he and Tackett stole a mid-size Ford tractor, which they took to Pierce's house. (J.A. at 548–49.) When Isenberg asked Pierce where he got the tractor, Pierce said he got it from "Chuck Floyd" for $1800, and produced a fake receipt for it. (J.A. at 579.) Isenberg ran a check on the name "Chuck Floyd," and could not find one in Butler or Warren County, where Pierce claimed he would be. (J.A. at 580.) Pierce subsequently pleaded guilty in Warren County Circuit Court to knowingly receiving stolen property, the Ford tractor. (J.A. at 582.)

Therefore, the district court had ample evidence to find that the prior bad acts occurred.

### 2. Purpose for Admission

Next, Pierce claims that the district court improperly admitted his previous crimes under Rule 404(b). "Rule 404(b) only bars evidence of 'prior bad acts,' such as a criminal conviction, that are offered to show criminal disposition or propensity. If the evidence has an independent purpose, its admission is not prohibited by Rule 404(b)." *See Ushery,* 968 F.2d at 580. In this case, the government explained that it sought to introduce the evidence under Rule 404(b) for

---

4. Fed.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

the following two reasons: (1) to show that Tackett's motive to burn the Church was to keep in Pierce's good graces; and (2) to show that Pierce utilized his economic control over Tackett to make him burn the Church.

At trial, the government developed a theory that presented Tackett as financially dependent upon Pierce. Pierce allegedly wanted the Church burned down. The only way for the government to prove Tackett's motive and Pierce's intent was to establish their relationship.

This case closely parallels our decision in *United States v. White,* 788 F.2d 390 (6th Cir.1986). In *White,* four men conspired and set fire to an African–American family's house in their Tennessee neighborhood. The district court allowed prior bad acts to come in against two defendants who were tried together, White and Castile. *Id.* at 393. At White and Castile's trial, the district court admitted evidence of check kiting and fraudulent credit card transactions. The Sixth Circuit affirmed on the basis that these activities went to motive. *Id.* at 393. "White's willingness to submit phony American Express charges for Castile tends to explain why Castile would be asked and would—without pay—want to help White with his 'problem.'" *Id.*

Rule 404(b) does not prevent the government from establishing how members of a conspiracy are related, solely because doing so would include evidence of prior criminal activities. Rule 404 prohibits such introduction only when the acts are being introduced to show propensity or conformity with past criminal activity. The crimes of theft and trafficking stolen property do not show a propensity to commit arson. Accordingly, this evidence is permissible under Rule 404(b) to establish Tackett's "motive" and Pierce's "intent."

### 3. Probative Value

▮ "Finally, in ruling on admission of 404(b) evidence, the district court must de-

termine whether the 'other acts' evidence is more unfairly prejudicial than probative." *Gessa,* 971 F.2d at 1262; see also Fed. R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice....").[5] The District Judge did not abuse his discretion. First, as discussed *supra,* evidence of Tackett's and Pierce's relationship was probative. Second, the District Judge observed the trial firsthand and was in the best position to assess the impact of the testimony. *Ushery,* 968 F.2d at 580. Third, and perhaps most importantly, the District Judge issued a number of limiting instructions to the jury to ensure that there would be no unfair prejudice (Trial volumes IV: 327–28; V: 367, 385–86, 407–408, 417; VII: 842–843). Therefore, the district court properly admitted the prior crimes under Rule 404(b).

## IV. Tackett's Issues

### A. The District Court's Decision Not to Sever the Trial

▮ Tackett contends that the district court erred by failing to grant his motion to be tried separately from Pierce. We find his argument unpersuasive. The decision to grant or deny severance is entrusted to the sound discretion of the district court. *United States v. Moreno,* 933 F.2d 362, 369 (6th Cir.1991). The district court did not abuse its discretion when it denied Tackett's motion for severance.

Tackett argues that he was prejudiced by being tried with Pierce, because they had mutually antagonistic defenses.[6] "Without a showing of compelling prejudice, a motion for severance should not be granted." *Id.* Furthermore, "as a general rule, persons jointly indicted should be tried together." *Id.* But, Federal Rule of Criminal Procedure 14 provides:

---

**5.** As noted above, we review this under an abuse of discretion standard.

**6.** Tackett also argues that the district court admitted his prior bad acts only because the government tried Pierce and him together. In his brief, however, he does not object that the Court

admitted these in violation of Federal Rule of Evidence 404. Furthermore, even if he would have, the prior acts came in to establish his motive. As noted above, such introduction is permissible under Rule 404(b).

If it appears that a defendant or the government is prejudiced by joinder of ... defendants ... for trial together, the court *may* order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14 (emphasis added).

The Supreme Court recently addressed the issue of severance in *Zafiro v. United States*, —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). In *Zafiro*, the government accused the defendants of distributing illegal drugs. Two of the defendants, Garcia and Soto, were carrying a box containing fifty-five pounds of cocaine up a staircase, when the police arrested them. At trial, Soto testified that he knew nothing about the drug conspiracy and was just helping Garcia carry the box. Garcia, on the other hand, argued that he was innocent and that the box belonged to Soto.[7] *Id.* at ——, 113 S.Ct. at 936. The district court denied the motions for severance, and the jury convicted all four Defendants.

■ The Supreme Court affirmed and held that mutually antagonistic defenses do not mandate severance. *Id.* at ——, 113 S.Ct. at 937. "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* at ——, 113 S.Ct. at 938. The Supreme Court went on to say that when the defendants are properly joined under Rule 8(b),[8] "[a] district court should grant a severance under Rule 14 if there is a serious risk that a joint trial would compromise a specific trial right of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* Such a risk would occur when evidence that

is inadmissible against one defendant if tried alone is admitted against a codefendant. *Id.* This would allow the prosecution to circumvent the rules by trying such individuals together. When the risk of such prejudice is high, a district court may order separate trials if necessary, but "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* Finally, "defendants are not entitled to separate trials merely because they may have a better chance of acquittal in separate trials." *Id.*

Tackett claims the district court should have granted severance for two reasons. First, he argues that the government would not have been able to introduce his prior criminal record if he was tried alone. Second, he claims that Pierce was trying to convict Tackett in order to get himself off.

■ As discussed above, the government introduced Tackett's prior criminal acts to show motive. The acts would have come in even if he had been tried alone. Severance would not have precluded the government from introducing motive evidence under Rule 404(b). Furthermore, Tackett himself brought in some of his prior acts on cross-examination. Finally, the Judge issued limiting instructions several times and told the jury to consider these acts only as evidence of motive and not as evidence of guilt.

■ Second, Tackett claims that Pierce's counsel was trying to convict Tackett, by showing that Tackett acted alone. This is similar to *Zafiro*, where the "two defendants both claim they are innocent and each accuses the other of the crime." *Id.* at ——, 113 S.Ct. at 938. In *Zafiro*, the Supreme Court held that cautionary instructions and proper jury instructions could cure this problem.

---

7. Two other Defendants were also involved in this case, and each also moved for severance, arguing that their defenses were mutually antagonistic. These Defendants were in the apartment where the box was being taken. One argued he was there visiting his girlfriend and had no idea what was transpiring. Drugs were also found in the apartment. The girlfriend argued that all the drugs in the apartment were her boyfriend's and she had no idea that these drug transactions were taking place.

8. Rule 8(b) provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Federal Rule of Criminal Procedure 8(b).

*Id.* at ——, 113 S.Ct. at 939. In this case, the District Judge made several cautionary instructions, and properly instructed the jury that "[y]ou must decide, for each defendant, whether the United States has presented proof beyond a reasonable doubt that the particular defendant is guilty of a particular charge." District Court's Jury Instructions at 27; *see also Zafiro,* —— U.S. at ——, 113 S.Ct. at 939 (holding similar jury instructions cure prejudice). Therefore, *Zafiro* controls and the District Judge did not abuse his discretion in denying severance.

### B. Alleged Government Intimidation of Witnesses

 Tackett contends that the district court erred by denying his motion for a new trial based upon "government intimidation of the witnesses." Tackett never raised the issue of governmental intimidation during trial, and therefore, according to Fed.R.Crim.P. 52(b), we review for plain error.[9] *United States v. Young,* 470 U.S. 1, 15–16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). Under the plain error doctrine, we determine if any errors below " 'seriously affect the fairness, integrity or public reputation of judicial proceedings.' " *Id.* at 15, 105 S.Ct. at 1046 (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). To review for plain error, we look to the entire record and determine if the alleged act resulted in a miscarriage of justice. *Id.* at 16, 105 S.Ct. at 1046–47.

 After reviewing the record as a whole, we find that the alleged government intimidation did not result in a miscarriage of justice. Tackett's conviction rested, at least in part, on the jury's rejection of Tackett's claim that he had been in Ohio on the weekend of the fire. Tackett presented witnesses who said he was at his brother's football game in Findlay, Ohio. Tackett claims that the jury would have accepted his alibi if he had been able to present all of the witnesses and evidence that confirmed his story. He

contends that the government deprived him of two alibi witnesses, Tucker Ballinger and Joseph Spalding, by intimidating them during special court-ordered interviews before they were to testify.

Review of the procedural circumstances that lay behind Tackett's alibi defense reveals why the government was interviewing witnesses during trial. The government originally asked Tackett to declare his alibi defense in a pretrial motion pursuant to Federal Rule of Criminal Procedure 12.1. Tackett eventually responded and revealed his planned alibi defense. The government reciprocated and revealed its list of rebuttal witnesses. Immediately before trial, however, Tackett officially abandoned his alibi defense. The United States quickly changed its strategy, in order to avoid prejudicing Tackett by mentioning his alleged alibi. Tackett once again renounced his alibi midway through trial.

At trial it became clear that Linda Tackett would produce an alibi defense.[10] She revealed that her alibi was identical to Brian Tackett's alibi. Brian Tackett reversed directions one more time. Tackett's indecisiveness placed the district court in a very difficult situation, and the district court could have barred Tackett from using his alibi defense altogether. *See United States v. Tinker,* 985 F.2d 241, 243 (6th Cir.1992) (the district court has "substantial discretion" in determining whether to hold parties to their pre-trial agreement). The district court chose not to follow this strict course, because the United States had prior knowledge of Tackett's alibi and the witnesses he might use. (J.A. at 321.) In order to be fair, the district court allowed the government an opportunity to prepare, and allowed the prosecution to interview Tackett's alibi witnesses before they took the stand.

Ballinger and Spalding both testified at post-trial proceedings that the interviewing officials had treated them "roughly."[11] Two

---

9. Rule 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

10. Linda Tackett is Brian Tackett's mother, and she was also tried for conspiracy. The jury found her not guilty.

11. Ballinger and Spalding are both on Tackett's brother's football team.

representatives of the United States interviewed each witness separately in the government's office.[12]

The officials interviewed Ballinger first. At the post-trial hearing, Ballinger revealed that the government officials accused him of lying when he recounted that he remembered seeing Tackett on the night of the football game. The officials apparently suggested that Ballinger would face perjury charges if they found out his testimony was false. The encounter was loud enough for Spalding, who was in the next room, to hear. Ballinger said the officials had not physically intimidated him, but left him "kind of scared." Ballinger's willingness to testify on Tackett's behalf, however, was unshaken. One of the defense attorneys, however, told him his testimony was not needed and sent him home.

Spalding claims a similar encounter with the officials. He alleges that one of the officials terminated the interview by snapping, "Just get ... the hell out of here, and the next time we see you we don't want to see any bitching from you." Spalding says he was very frightened. Despite this treatment, Spalding claims he still would have testified on Tackett's behalf. The defense attorneys, however, also sent him home without using him as a witness.

Linda Tackett's attorney verified this, stating that he had sent them home because he felt their testimony was "not essential." Furthermore, both witnesses admitted they were not sure whether Brian Tackett attended the football game. We find it peculiar that the defendants did not bring this "intimidation" to the Court's attention during the trial. Instead, defense counsel just dismissed both witnesses, once he apparently heard what happened.[13]

 The right of a defendant to establish a defense by presenting his own witnesses is a fundamental element of due process. *Webb v. Texas,* 409 U.S. 95, 93 S.Ct.

351, 34 L.Ed.2d 330 (1972) (per curiam). Courts have held that a variety of prosecutorial and judicial actions aimed at discouraging defense witnesses from testifying deprive the criminal defendant of his right to due process. *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam) (The judge admonished the defense witness, telling him that if he lied the judge would personally see to it that his case went to the grand jury and he would be indicted for perjury. The witness chose not to testify and the Supreme Court found reversible error.); *United States v. Thomas,* 488 F.2d 334, 335 (6th Cir.1973) (per curiam) (Secret Service agent approached witness before he was to testify and told him that if he testified he would be prosecuted for misprision of a felony. The Sixth Circuit held this was reversible error, where unnecessary *ex parte* communications between agent of prosecutor and witness appear to intimidate witness.). *Webb,* however, does not stand for the proposition that merely warning a witness of the consequences of perjury demands reversal. *United States v. Smith,* 997 F.2d 674, 679 (10th Cir.1993). "Judges and prosecutors do not necessarily commit a *Webb* type violation merely by advising a witness of the possibility that he or she could face prosecution for perjury if his or her testimony differs from that he or she has given previously." *Id.* at 680. In fact, the government has an obligation to warn unrepresented witnesses of the risk that the testimony they are going to give can be used against them. *United States v. Jackson,* 935 F.2d 832, 847 (7th Cir.1991). "Where, however, the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong." *Id.*

In the present case, it does not appear that the official's interrogation, while inappropri-

---

12. These agents are considered an arm of the prosecutor, and thus, we look to see if their acts constituted prosecutorial misconduct. *United States v. Thomas,* 488 F.2d 334, 336 (6th Cir. 1973) (per curiam).

13. It appears that defense counsel's decision not to put these two witnesses on the stand was probably good trial strategy. Neither witness is sure whether he saw Brian Tackett at the football game. Additionally, the district court found that the testimony of these two witnesses would have been cumulative.

ate, mandates reversal. The fact that the prosecutor's agents became belligerent and hostile towards the defense witness is not dispositive. The defense must show that the contact substantially interfered with any free and unhampered determination the witness might have had as to whether to testify. *Smith*, 997 F.2d at 680.

In this case, both witnesses were willing to testify after the interrogation. The interviews were not completely unnecessary or without purpose. Moreover, the district court allowed the interviews, and the defense counsel never objected to them. Although the interviews left Ballinger and Spalding understandably agitated, the interrogations did not affect their ability to testify or alter the probable outcome of the trial. Therefore, the government's actions did not result in error in this case.

## C. Ineffective Assistance of Counsel

■■■ Tackett next contends he received ineffective assistance of counsel during the trial. Traditionally, ineffective assistance of counsel claims are not cognizable on direct appeal. *United States v. Gonzales*, 929 F.2d 213, 215 (6th Cir.1991). The proper avenue for raising such claims is through a collateral attack on the conviction pursuant to 28 U.S.C. § 2255. *United States v. Goodlett*, 3 F.3d 976, 980 (6th Cir.1993). If the parties have adequately developed the record, however, the court can elect to hear the issue on direct appeal. *Id.; United States v. Wunder*, 919 F.2d 34, 37 (6th Cir.1990). In this case, we find that the record is adequately developed for us to consider this issue.

■■■ Ineffective assistance of counsel claims are mixed questions of law and fact. *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). We review ineffective assistance of counsel issues *de novo* on appeal. *Sims v. Livesay*, 970 F.2d 1575, 1579 (6th Cir.1992).

■■■ In this case, we find that Tackett received effective assistance of counsel.

A convicted defendant's charge that he was denied effective assistance of counsel, to be successful, requires that the defendant prove: (1) that counsel's performance was

deficient; and (2) that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.

*Meeks v. Bergen*, 749 F.2d 322, 327 (6th Cir.1984). Judicial scrutiny of counsel's performance must be highly deferential. *Id.* We presume from the outset that a lawyer is competent, and therefore, "the burden rests on the accused to demonstrate a constitutional violation." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984).

■■■ The first part of the analysis requires that a defendant show that the attorney's efforts fell below an "objective standard of reasonableness ... under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064. Tackett has failed to do this. Tackett claims that he received ineffective assistance because his trial counsel did not (1) properly investigate his alibi, (2) present all of the witnesses that could have been presented, or (3) reveal the government intimidation. First, Tackett could not expect counsel to properly investigate an "alleged alibi," when Tackett changed his mind as to whether or not to use it at every turn in the case. In fact, Tackett did not finally make up his mind until the government had rested. This put everyone, most notably Tackett's attorney, in a precarious position. Second, Tackett's counsel did not present every witness because many were cumulative or unreliable. (J.A. at 370.) Third, both Ballinger and Spalding would probably have been impeached if they testified. At the post-trial hearing, Ballinger and Spalding revealed that they were not positive whether they saw Tackett at the game. Finally, it is not clear that Tackett's counsel ever knew of the intimidation. (J.A. at 371 n. 1.) Therefore, Tackett has failed to show his counsel's performance was deficient.

## D. Perjured Testimony Claim

Tackett also moves for a new trial on the grounds that the government presented perjured testimony. A district court's denial of a new trial should not be disturbed absent an abuse of discretion. *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir.1982).

■ To prevail on a claim that the government presented perjured testimony, Tackett must show "(1) that the statements were actually false; (2) the statements made were material; and (3)[the] prosecution knew they were false." *United States v. Farley*, 2 F.3d 645, 655 (6th Cir.1993). Tackett has failed to meet the first prong.

■ Two witnesses, Lewis Jenkins, Sr. and Lewis Jenkins, Jr., each said that Linda Tackett paid them on December 7, 1991, at the Tackett's farm in Bowling Green, Kentucky. Both said they saw Brian Tackett. Tackett, however, claimed he was in Findlay, Ohio.

After trial, Tackett called Neton Allen Sisk, who worked on the Tackett farm with the Jenkinses. Sisk stated that the Tacketts paid them on December 8. This does not establish that the Jenkins's statements were false, but only that someone was mistaken about the date. The jury had a chance to observe the witnesses' credibility, and Tackett could have called Sisk at trial. Additionally, the government presented other evidence to establish that Tackett was in Bowling Green on the day of the fire. Finally, even if the statements were false, Tackett fails to meet the third prong because he has not even hinted that the government knew they were false.

Tackett also claims that the government threatened Kim Patton and forced her to lie in order to convict him. Patton, however, stated at trial that no one threatened her or promised her anything as compensation for testifying. Tackett presents no evidence that Kim Patton perjured herself, except his own testimony.[14] The jury chose to believe Kim Patton over him. Therefore, we fail to find any evidence of perjured testimony.

The district court did not abuse its discretion by denying Tackett's motion for a new trial based on "perjured" testimony.

### E. District Court's Questions

■ Tackett argues that the district court improperly questioned witnesses. At trial, the defense failed to object to the district court's questions, and therefore, the proper standard of review is plain error. *United States v. Young*, 470 U.S. 1, 15–16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); Fed.R.Crim.P. 52(b).

■ The trial judge's duty is to conduct a trial in an orderly fashion and obtain truth and justice. *United States v. Slone*, 833 F.2d 595, 597 (6th Cir.1987). "He must see to it that the issues are not obscured and the testimony is not misunderstood. The trial court has the right to interrogate witnesses for this purpose." *Id.* The District Judge asked a few follow-up questions to two witnesses. The first witness was Thurmon Tackett. He asked Thurmon Tackett questions because Mr. Tackett was attempting to evade the government's questions. The District Judge posed the questions in an even-handed, non-inflammatory manner. He also asked three questions of Morgan White. This was solely to clarify that no one had answered White's phone calls to the Tackett residence on December 6. The District Judge's questions were both warranted and necessary, and do not mandate reversal.

### F. Fundamental Unfairness

■ Tackett claims the trial was fundamentally unfair, and thus, he should be granted a new trial. The standard of review is abuse of discretion. *Barlow*, 693 F.2d at 966.

In his brief, Tackett simply asserts the trial was fundamentally unfair. He gives no reasons for this. "Errors that might not be so prejudicial as to amount to a deprivation for due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.1983). Tackett fails to explain how his trial was fundamentally un-

---

**14.** Tackett also presented to the district court tapes of several of his phone calls to Tommy Patton, Jr. He claims that these phone calls established that Kim Patton committed perjury at the trial. On the tapes, however, Tommy Patton claims he is going to murder Kim Patton and will soon be "on the inside for murder." Defendant's Post–Trial Exhibit 5. Tape-recorded conversations between Tackett and the man planning on murdering Kim Patton are not convincing evidence to show that Kim Patton perjured herself.

fair and fails to point to an accumulation or even one error upon which to base this claim. We find no evidence of the trial being fundamentally unfair.

## V.

Finding no errors that warrant reversal, we **AFFIRM** the Defendants' respective convictions.